FILED

MAR 1 5 2021

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
                    DEPUTY CLERK

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### San Antonio Division

UNITED STATES OF AMERICA and
STATE OF TEXAS *ex rel.*
MONTIE BLAND and BRIAN ELLISON,

       *Plaintiffs,*

    *v.*

ASCENSION HEALTH SENIOR CARE,
ASCENSION PROVIDENCE, NAZARETH
ASSISTED LIVING CARE CENTER, and
SELECT REHABILITATION, INC.,

       *Defendants.*

Civil Action No. **SA21CA0269 OG** _____

**FILED UNDER SEAL**
**Pursuant to 31 U.S.C. § 3730(b)(2)**

## COMPLAINT

    *Qui tam* relators Montie Bland and Brian Ellison ("Relators") bring this action under the

federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq.,* on behalf of the United States of

America and under the Texas Medicaid Fraud Prevention Act ("TMFPA"), Tex. Hum. Res. Code

§ 36.002, *et seq.,* on behalf of the State of Texas against Defendants.  Relators allege as follows:

### NATURE OF THE CASE

    1.      Defendants own and operate several chains of skilled nursing facilities ("SNFs"),

long term care facilities ("LTCFs") and outpatient rehab centers throughout, *inter alia,* the States

of Texas, Missouri, and Kansas.

    2.      During the relevant time period, Medicare Part A reimbursed SNFs on a per-patient,

per-day basis.  The amount of money a SNF received for any given patient was determined by that

patient's Resource Utilization Group ("RUG") score.  RUG scores, in turn, were driven in part by

the amount of therapy a patient required.  The more therapy a patient needed, the higher the RUG

score. The higher the RUG score, the more money Medicare Part A would pay a SNF to care for the patient.

3.      Similarly, although Medicare does not cover all of the services provided in LTCFs, Medicare Part B does provide coverage for therapy that is provided in such facilities, as well as therapy that is provided on an outpatient basis at LTCFs or other facilities.

4.      In all three of the above contexts — in SNFs, in LTCFs, or on an outpatient basis — Defendants engaged in a scheme to force therapists to provide medically unnecessary therapy in order to artificially inflate the amounts they received from Medicare.

5.      As part of this scheme, Defendants falsely certified to Medicare that the therapy services they provided were medically reasonable and necessary, and otherwise in compliance with all relevant rules and regulations regarding the Medicare program.  Defendants' claims for payment to Medicare were false as that term is used in the False Claims Act, 31 U.S.C. § 3729, *et seq.*

6.      Defendants' scheme began no later than 2013, was personally witnessed by Relators as late as 2017, and, on information and belief, continues to this day.

7.      This action is not based upon the prior public disclosure of allegations or transactions in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; in the news media; or in any other form as the term "publicly disclosed" is defined in 31 U.S.C. § 3730(e)(4)(A).

8.      To the extent there has been a public disclosure unknown to Relators, they are original sources under all relevant statutory provisions.  Relators, prior to filing this action, voluntarily disclosed and provided to the Government the information on which their allegations

2

are based and/or have knowledge that is independent of, and materially adds to, any publicly disclosed allegations or transactions.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. §§ 3732(a), which confer jurisdiction over actions brought under 31 U.S.C §§ 3729 and 3730. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b).

10.    This Court has personal jurisdiction over Defendants, and venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because Defendants transacted business and committed violations of 31 U.S.C. § 3729 in this District.

## PARTIES

**Relators**

11.    Relator Montie Bland is a Texas resident.  Mr. Bland was employed by Defendant from 2002 until June of 2016.  Through his employment, Mr. Bland gained first-hand knowledge of the fraud described herein.

12.    Relator Brian Ellison is a Texas resident.  Mr. Ellison was employed by Defendant from 2012 until April of 2017. Through his employment, Mr. Ellison gained first-hand knowledge of the fraud described herein.

**Defendants**

13.    Defendant Ascension Health Senior Care ("Ascension") is a non-profit corporation organized and existing under the laws of the State of Missouri.  Its headquarters and principal place of business are located at 4600 Edmundson Road, St. Louis, Missouri.  Ascension, either directly or through subsidiaries, owns and operates various SNFs, LTCFs, and outpatient rehab facilities

3

throughout the country. At all times relevant to this action, Ascension owned and operated the facilities at which the fraudulent activities alleged herein occurred. Ascension's control of these entities permeated all aspects of their day-to-day business, such that Ascension is legally responsible for their conduct during the relevant period.

14.    Defendant Ascension Providence is a non-profit corporation organized and existing under the laws of the State of Texas. Ascension Providence is a wholly-owned subsidiary of Ascension and, in turn, owns and operates Saint Catherine Center.

15.    Defendant Nazareth Living Care Center is a non-profit corporation organized and existing under the laws of the State of Texas. Its headquarters and principal place of business are located at 1475 Raynolds Street, El Paso, Texas 79903.

16.    Defendant Select Rehabilitation, Inc., is a corporation organized and existing under the laws of the State of Illinois. Its headquarters and principal place of business are located at 2600 Compass Road, Glenview, IL 60026. Select provides therapy and rehabilitation services to facilities throughout the United States, including those enumerated above.

**The Government Payers**

17.    The United States is a real party in interest under the FCA and ultimately paid the false claims alleged herein — Medicare claims in full and Medicaid claims in part — and is entitled to the bulk of the recovery sought by this action. Medicare is a federal health insurance program administered by CMS for the elderly and disabled. See 42 U.S.C. §§ 1395-1395hhh. Medicaid is a jointly-funded federal and state public-assistance program that pays for certain medical expenses incurred by low-income patients. *See* 42 U.S.C. §§ 1396-1396v.

18.    The State of Texas is a real party in interest under the Texas Medicaid Fraud Prevention Act ("TMFPA") and ultimately paid a portion of the false Medicaid claims alleged

4

herein. *See* 42 U.S.C. §§ 1396-1396v; *see also* Tex. Hum. Res. Code § 36.002, *et seq.*, and Tex. Hum. Res. Code Ann. § 32.039, *et seq.* Texas's defrauded Medicaid program is administered and supervised by the Health and Human Services Commission, which is responsible for administering the Texas Department of Aging and Disability Services, Texas Department of State Health Services, and the Texas Department of Family and Protective Services.

19.     The United States and the State of Texas are referred to collectively as the "Government."

## RELEVANT STATUTES AND REGULATIONS

### False Claims Act

20.     The FCA imposes liability on any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval ("false claim"). 31 U.S.C. § 3729(a)(1)(A). The FCA defines "claim" to include any request or demand, whether under contract or otherwise, for money, that is made to an agent of the United States or to a contractor, if the money is to be spent to advance a government program or interest and the government provides or will reimburse any portion of the money. 31 U.S.C. § 3729(b)(2). The FCA defines "knowingly" to mean actual knowledge, deliberate ignorance of truth or falsity, or reckless disregard of truth or falsity; specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1).

21.     The FCA further imposes liability on any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim ("false statement"). 31 U.S.C. § 3729(a)(1)(B). The FCA defines "material" to mean having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. 31 U.S.C. § 3729(b)(4).

22.     The FCA also imposes liability on any person who conspires to commit violations on its prohibitions upon false claims or false statements ("conspiracy claim").   31 U.S.C. § 3729(a)(1)(C).

**Texas Medicaid Fraud Prevention Act**

23.     The TMFPA, among other things, makes it unlawful to knowingly make or cause to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program, or to knowingly conceal or fail to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized.  Tex. Hum. Res. Code § 36.002, *et seq.*

24.     The TMFPA also provides that it is unlawful to knowingly enter into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another person in obtaining an unauthorized payment or benefit from the Medicaid program or a fiscal agent.  *Id.*

25.     The TMFPA provides that a person acts "knowingly" if that person has knowledge of the information, acts with conscious indifference to the truth or falsity of the information, or acts in reckless disregard of the truth or falsity of the information.  Tex. Hum. Res. Code § 36.0011. Notably, the TMFPA explicitly provides that "[p]roof of the person's specific intent to commit an unlawful act [] is not required in a civil or administrative proceeding to show that a person acted 'knowingly' with respect to information . . ." Tex. Hum. Res. Code § 36.0011.

**The Medicare and Medicaid Programs**

**Background**

26.     Medicare is a federal health insurance program created by Congress in 1965 for the elderly and disabled. *See* 42 U.S.C. §§ 1395-1395hhh.  It is the nation's largest health insurance

6

program and covers nearly 40 million people. Medicare pays doctors, hospitals, pharmacies, and

other providers and suppliers of medical goods and services according to government-established

conditions and rates. *Id.* The Medicare program is comprised of several parts, of which two, Parts

A and B, are relevant here.

27.     Medicare Part A is a prospective payment system of insurance that helps cover

certain types of care provided by SNFs, within specified limits, including physical, occupational,

and speech therapy, as well as other services provided on an in-patient basis. *See* 42 U.S.C.

§ 1395c; 42 CFR § 409.20. Medicare Part A reimburses SNFs on a per patient, per diem basis.

28.     Medicare Part B pays providers retrospectively on a fee-for-service basis, including

for therapeutic services provided on an inpatient basis where the patient's Part A coverage has

lapsed, and for therapeutic services that are provided at LTCFs or on an outpatient basis.

29.     Medicaid programs are administered by the various States, and are jointly financed

by the federal and State governments. The federal government pays its share of medical assistance

expenditures to the State on a quarterly basis according to statements of expenditures submitted

by the State and a formula described in sections 1903 and 1905(b) of the Medicaid Act. The State

pays its share of medical assistance expenditures from state and local government funds in

accordance with section 1902(a)(2) of the Medicaid Act.

### Reimbursement Methodology

30.     During the relevant period, the daily reimbursement received by a SNF for the care

of each patient was based upon that patient's RUG score.[1] The RUG score was used by CMS as

---

[1] The Part A reimbursement methodology changed to a Patient Driven Payment Model
("PDPM") in October of 2019. *See generally* "Patient Driven Model," available at
https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/SNFPPS/PDPM        (last

an indicator of how much time and resources a SNF will likely need to expend to properly care for each patient — the higher the score, the more money Medicare paid the SNF by way of reimbursement. *See generally* 42 C.F.R. §§ 413.335, 413.337.

31.    RUG Scores, in turn, were based upon several factors that are contained in what is known as a "Minimum Data Set" ("MDS"). An MDS was completed when a patient was admitted to a SNF, and periodically afterwards. At the Defendants' facilities, the MDS was completed by employees known as "MDS Coordinators." The MDS provides an evaluation for the two factors that primarily determine the patient's RUG category: 1) the patient's therapy needs; and 2) the patient's "Activities of Daily Living" ("ADL") score.

32.    The first category is straightforward. The MDS reports the type of therapy — speech, occupational, or physical — and the amount of therapy that the patient requires during the relevant period.

33.    The second category, ADL score, quantifies the patient's need for assistance in day-to-day living, including using the toilet, eating, and dressing.

34.    Taken together, the patient's therapy needs and ADL score are used to calculate the patient's RUG category. *See generally* CMS's LTCF Resident Assessment Instrument 3.0 Manual (Ver. 1.17.1), Ch. 6; Medicare Program Integrity Manual, Ch. 6.

---

accessed March 10, 2021). However, like the RUG model before it, the PDPM relies in part on the amount of therapy provided in order to determine the appropriate level of reimbursement. *See generally* "PDPM Fact Sheet," available at https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/SNFPPS/Downloads/PDPM_Fact_Sheet_Template_Payment-Overview_v5.zip (last accessed March 10, 2021). Thus, under either system, Defendants' fraudulent practices result in substantial overpayments from the Government. Moreover, the Part B reimbursement methodology continues to be based upon minutes of therapy provided.

35.     The highest-paying rehabilitation RUG category was denoted by "RU," which means "Rehabilitation Ultra High." To qualify for that category, a patient must receive at least 720 minutes of therapy in two or more disciplines, as measured over a seven-day assessment (or "look-back") period, with the patient receiving therapy in at least one therapy discipline on five of those seven days. This category was reserved for the minority of patients who are physically capable of and can benefit from such an intensive therapy schedule (nearly two-and-a-half hours daily for five days a week).   Indeed, this level was "intended to apply only to the most complex cases requiring rehabilitative therapy well above the average amount of service time."   63 Fed. Reg. 25,252 at 26,258 (May 12, 1998).   This was the category that Defendants used to defraud the United States. By manipulating patients' RUG scores to place them into the RU category when they should have been in other, less expensive categories, Defendants received more compensation than they were due.

36.     Medicare requires each facility to conduct an "accurate . . . assessment of each resident's functional capacity," 42 C.F.R. § 483.20, because the difference in reimbursement levels between the various RUG categories is significant. As a result, Medicare Part A only pays for SNF care if the patient is "correctly assigned" to a RUG level. 42 C.F.R. § 424.20.

## Submission of Claims and Certifications of Compliance

37.     Claims for services provided in SNFs, hospitals, and outpatient therapy clinics are submitted to Medicare on Claim Form 1450 or its electronic equivalent, 837I.  Medicare processes these claims and pays the facility for the services billed. CMS-1450 notifies the provider that:

THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARY PENALTIES AND ASSESSMENTS AND

9

MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S).

The form also requires entities submitting a claim to certify:

> Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts . . . .

38.     To submit claims electronically, which most providers, including Defendants, are required to do, a provider must enroll in Medicare's Electronic Data Interchange (EDI) program. The enrollment process provides for the collection of the information needed to successfully exchange EDI transactions with Medicare and establishes the expectations of the parties to the exchange. The unique EDI number issued to a provider, along with its password, acts as the provider's electronic signature for claim submission.

39.     As part of the EDI enrollment process, a provider is required to certify, among other things, that "it will submit claims that are accurate, complete, and truthful," that "it will acknowledge that all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law," and that "it will research and correct claim discrepancies." To complete its EDI enrollment, a provider representative must "certify that I have been appointed an authorized individual to whom the provider has granted the legal authority to enroll it in the Medicare Program . . . and to commit the provider to abide by the laws, regulations and the program instructions of Medicare." *See* Medicare Claims Processing Manual, Ch. 24, § 30.2.

10

40.    Upon information and belief, Relators allege that in enrolling in the EDI program, Defendants made these or similar certifications.

41.    Once an institutional provider has been enrolled in the EDI program, the provider submits Medicare claims electronically using CMS Form 837I. The electronic billing specifications and data elements prescribed by CMS for CMS-837I are consistent with the data elements present on the CMS-1450 paper claim form.

42.    Defendants, as participants in the Medicare program, submitted its bills for services to Medicare using the CMS-1450, CMS-837I, or their equivalents, containing the language cited in the preceding paragraphs, or similar language, and indicating their agreement to be bound by the laws and regulations governing Medicare reimbursement for services, including but not limited to the certification of compliance with 42 U.S.C. § 1395y(a)(1)(A).

43.    Additionally, all three types of facilities are required to complete Form CMS-855A in order to initially enroll in Medicare.  That form provides in relevant part:

> These are additional requirements that the provider must meet and maintain in order to bill the Medicare program. Read these requirements carefully. By signing, the provider is attesting to having read the requirements and understanding them. By his/her signature(s), the authorized official(s) named below and the delegated official(s) named in Section 16 agree to adhere to the following requirements stated in this Certification Statement:
>
> *    *    *
>
> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. … I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.
>
> *    *    *
>
> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

44.     In addition, at the end of their annual cost reporting period, SNFs and hospitals must submit cost reports detailing the expenses and revenues for their facilities, along with the patient activity.  The annual cost report is the final claim for payment and is submitted on CMS Form 2540-10 in the case of SNFs, or CMS Form 2552-2010 in the case of hospitals.  Annual cost reports constitute the final accounting of the facility's federal program reimbursement. The United States relies upon the annual cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare, Medicaid or other government programs.

45.     In order to receive payment, the provider must certify that all data in its annual cost report is accurately and truthfully reported and that it has complied with all applicable laws and regulations.  Regardless of which form is used, the cost report requires the provider employee or agent submitting the report to certify that he or she has read a statement which provides in relevant part:

> I have examined the accompanying electronically filed or manually submitted cost report and the balance sheet and statement of revenue and expenses ... and that to the best of my knowledge and belief it is a true, correct, and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations. (Emphasis added).

46.     Federal law specifically obligates every provider to return to the United States any payment that it improperly receives. It is a felony for an entity to conceal or fail to disclose errors in payments received from government-funded health insurance programs. 42 U.S.C. § 1320a-7b(a)(3). After the end of each hospital's fiscal year, a hospital must submit a cost report to its fiscal intermediary or MAC, stating the amount of Part A reimbursement the provider believes it

is due for the year. See 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20; see also 42 C.F.R. § 405.1801(b)(1).

47.    Defendants submitted, and the United States and State of Texas relied upon, the statements and certifications contained in Defendants' applications, agreements, claims, and cost reports. These statements and certifications were material to Defendants' eligibility to receive payments from the Medicare and Medicaid programs.

## DEFENDANTS' FRAUDULENT CONDUCT

48.    This case arises from Ascension's desire to maximize therapy revenue at the expense of its patients and the American taxpayer.  That desire led Ascension executives to pressure regional managers, facility supervisors and therapists to increase without justification patient RUG scores and the therapy payments derived from Medicare on behalf of those patients.

49.    One such regional manager was Michael Olmstead, at the time a Vice President of Long Term Care Services at Providence Healthcare Network (an Ascension subsidiary) from 2001 until 2017, and Regional Executive Director at Ascension Senior Living from 2017 until October of 2019.  During the relevant period, Mr. Olmstead oversaw, *inter alia*, the following Ascension facilities:

- St. Catherine Center, a skilled nursing and long-term care facility located at 300 West Highway 6, Waco, Texas 76712;

- Towers Nursing Home, located at 907 Garwood, Smithville, Texas, 78957; and

- Defendant Nazareth Living Care Center, located at 1475 Raynolds Street, El Paso, Texas 79903.

50.     In order to achieve his superiors' unrealistic directives, Mr. Olmstead embarked on a campaign of intimidation and retaliation, ousting one direct report after another until he finally hired a supervisor willing to support his illegal efforts.

51.     Relator Bland began working part-time at St. Catherine's in 2002, and was promoted to full-time Rehab Manager in 2006.  In that capacity, Relator Bland's duties included supervising the therapists who worked with the patients.

52.     At the time, St. Catherine's (as well as the other facilities located at Providence Park) was owned by Defendant Ascension Providence, which was, through a chain of intermediaries, a wholly-owned subsidiary of Defendant Ascension Health.  (At the time, Defendant Ascension Providence was known as Providence Health Services of Waco).

53.     Relator Ellison began working at Ascension Providence in February of 2012, and in August of 2014 was promoted to Supervisor of Outpatient Rehab.  In September of 2014, Relator Ellison's department was moved to a nearby, new facility also owned by Ascension Providence, known as Woodway Plaza.

54.     Both Woodway Plaza and Saint Catherine's were overseen by Michael Olmstead. In late 2012 or early 2013, both Relators became aware that Relator Bland's immediate supervisor, Director of Rehab Gwen Houseman, was being pressured by Mr. Olmstead to increase RUG scores. Specifically, Ms. Houseman was meeting one-on-one with Mr. Olmstead approximately once per week. Ms. Houseman then began having weekly meetings with Relators, Richard Stout, and Tonya Rivera, who was the manager of acute care rehab.  At these meetings, she would relay whatever instructions Olmstead had conveyed to her in their meeting.  Olmstead's primary instruction was that the percentage of patients in the Ultra High RUG category — which at the time was approximately 20 to 30 percent — had to "significantly increase." Ms. Houseman also

14

instructed Relator Bland to begin printing out and providing her with records showing the percentage of patients in the Ultra High category.

55.     In 2014, Ascension Health created a subsidiary to manage all of its skilled nursing and long-term care facilities.  That subsidiary is Defendant Ascension Senior Health Care.  As part of that reorganization, the Providence Park facilities were acquired by Ascension Senior Health Care.

56.     During this time period, the pressure exerted by Mr. Olmstead increased. Ultimately, in late 2013 or early 2014, Ms. Houseman was forced into early retirement, due at least in part to her refusal to acquiesce to Mr. Olmstead's desire for higher RUG scores.  Specifically, upon returning from a vacation, Ms. Houseman was congratulated by an employee who believed she was soon retiring.  Upon investigating further, Ms. Houseman learned that she was to be terminated from Ascension, and that she could either "voluntarily" retire, thus retaining her pension and other benefits, or she would be fired.  Ms. Houseman expressed to Relator Bland profound shock and disappointment regarding these developments.

57.     After her departure, Ms. Housman was replaced by Richard Stout.  Unlike Ms. Housman, Mr. Stout invited Relator Bland to accompany him to the meetings with Mr. Olmstead. At these meetings, Relator Bland learned for the first time that Mr. Olmstead's goal — which Olmstead claimed came from Ascension corporate headquarters — was to have a staggering 90% of patients in the "Ultra High Rehab" category.

58.     As set forth above, the Ultra High Rehab category is the most expensive category, and is reserved for patients with "the most complex cases" that can benefit from intense amounts of therapy "well above the average."  Thus, unless a therapy provider simply excludes all other

patients — which Ascension did not — there is simply no way to justify putting 90% of patients into the Ultra High Category.

59.     Approximately one year after his promotion to Rehab Director, Mr. Stout, unwilling to provide medically unnecessary services, and unable to comply with the absurd 90% directive in any other way, stepped down.

60.     The search then began for a replacement for Mr. Stout. As part of that search, candidates were interviewed in one-on-one settings by the people that would directly report to them, including Relators Ellison and Bland. During this process, Relators interviewed, among others, Carol Elassad. In her interviews with Relator Ellison and with Relator Bland, Ms. Elassad boasted that she had raised RUG scores at her prior jobs and stressed that she intended to do so at Ascension as well.

61.     Against the advice of Relator Ellison and others, Mr. Olmstead hired Ms. Elassad. In Ms. Elassad, Mr. Olmstead found a willing accomplice to Ascension's fraudulent schemes.

62.     True to her word, Ms. Elassad promptly sought to achieve a 90% rate of Ultra High RUG scores through fraud. Both Relators witnessed Ms. Elassad's wrongdoing first-hand. From the outset, Ms. Elassad set in place a number of directives to raise RUG scores. Specifically, she instructed Relator Bland to pressure the therapists under his supervision to classify patients in the Ultra-High RUG category regardless of whether that category was appropriate. If any patient was not placed in the Ultra High category, Relator Bland was instructed to question the therapist as to why and pressure them to change their assessment.

63.     Ms. Elassad also instructed Relator Bland to "write up" any therapists who routinely failed to place patients into the Ultra High category. On numerous occasions, Ms.

Elassad bemoaned the fact that she was unable to simply fire therapists on the spot, which would have been her preferred method of enforcement.

64.    Ms. Elassad also met with the Lead Therapists of each discipline and, occasionally, with the entire therapy staff.  At all times, her message was unrelenting: staff must achieve an Ultra High rate of 90% or face the consequences.

65.    Indeed, both Relators witnessed Ms. Elassad make the following statements, as well as other, similar statements:

- "It doesn't matter what the patient needs...[g]et them RUGS."

- "We're going to make as much money as possible at this."

- "I want the highest Medicare payments and longest length of stay. Get them on the highest paying program for the longest time possible. Grab all the Medicare money you can. Whether they need it or not."

66.    Likewise, Relator Bland attended weekly meetings where therapists were forced to justify discharging patients or providing less therapy than Ms. Elassad would have liked.

67.    Compounding the fraud, Ms. Elassad also compelled therapists to contest Medicare denials of coverage by lying to the Medicare representatives responsible for overseeing disputes. When Relator Bland expressed reservations about this behavior, he was written up by Ms. Elassad and told that further "write ups" could result in his termination.  In the fifteen years that he worked at Ascension, this is the only formal reprimand Relator Bland ever received.  Ms. Elassad also stated in no uncertain terms, "If the staff will not comply, they will be replaced. There are plenty of therapists who will do what we require . . . if they are not willing to fall in line, there are lots of therapists that will take their place and do it gladly."

68.    Ms. Elassad was not alone in her campaign. Her efforts were directed by Mr. Olmstead, and he, in turn, claimed to have received those directives from Ascension headquarters.

Facts independently witnessed by Relators confirm this.  On multiple occasions, Ascension upper management performed on-site inspections at Providence Park, during which they went to the therapy department to observe and do "walk-throughs."  They also met with Olmstead to discuss budget, operations, and specifically how therapy played a critical role in meeting budgetary goals. Later, Olmstead told Relators that Ascension upper management was monitoring RUG levels and it was their duty "to maximize those RUG levels to meet their expectations." To that end, a printed report was submitted weekly to Ascension upper management which summarized RUGs levels and length of stay for Medicare patients.

69.     Despite her unreserved willingness to defraud Medicare, Ms. Elassad apparently did not achieve results quickly enough for Mr. Olmstead or his superiors.  In April of 2016, Mr. Olmstead met with Relator Bland and informed him in no uncertain terms that if the RUG scores did not rise further, the entire therapy department would be replaced by an outside provider, Select Rehab, which is known in the industry for its capacity to increase RUG scores.  Mr. Olmstead reiterated that this decision was out of his hands.

70.     Approximately one month later, Mr. Olmstead's prediction came to pass.  Select Rehab was hired to take over therapy at all of the relevant facilities, as well as others.  Ms. Elassad was relieved of her duties regarding in-patient therapy and moved to Woodway Plaza, where she oversaw outpatient therapy.

71.     Upon receiving the contract to provide therapy at the Ascension facilities, Select provided offers of employment to the therapists that were then on-staff at those facilities, including Relator Bland.

72.     Shortly thereafter, however, Relator Bland was terminated by Select for pre-textual reasons.  This is a tactic commonly employed by Select in order to remove qualified therapists

18

from supervisory positions, and instead fill those roles with more malleable, less qualified individuals.

73.     Ms. Elassad was replaced by Select employee Tangela Ratliff, who in turn answered to Select Regional Vice President Gina Harris.

74.     Over the next several months, Relator Ellison witnessed Select's efforts to increase RUG scores.  These efforts consisted primarily of instituting a "90% efficiency" policy.  Therapists were required to spend no more than 10% of their time on non-reimbursable activities, such as paperwork or administrative functions.  Because the only reimbursable activity a therapist performs is therapy, this meant that therapists were forced to spend 90% of their time performing therapy, regardless of patient need.  Because therapists have no way to increase the total number of patients they see, this led inevitably to patients receiving more therapy than they actually needed.

75.     Because the amount of therapy a patient receives is one of the largest factors in determining RUG scores, the end result was exactly what Olmstead had sought to achieve for so long — patients were pushed into the Ultra High RUG category, regardless of their actual needs.

76.     Ironically, much of what Relator Ellison learned about Select's methods came from Ms. Elassad.  Now relegated to what she viewed as a lesser position within Ascension, Ms. Elassad initially gloated to Mr. Ellison that Select was unable to force therapists to comply with its directives, and as a result, was firing a large number of them.

77.     Around October or November of 2016, however, Ms. Elassad changed her tune because Select had succeeded in raising the Ultra High numbers.  Ms. Elassad routinely complained that she could have achieved the same increase in RUG scores that Select achieved, if only she had been given more leeway.  For example, Ms. Elassad noted that Select was able to —

and apparently did — fire its own therapists on the spot, without the interference of Ascension's HR department.

78.     Relator Ellison's employment at Providence Park ended on or about April 2017, but as of that time, Select and Ascension's scheme was in full swing. Medicare data further reflects that in 2018 — the latest year for which data is publicly available — St. Catherine's, Towers, and Nazareth each had well over 50% of their patient days billed to the Ultra High RUG category, and well over 50% of their unique beneficiaries admitted as Ultra High. Upon information and belief, Ascension's scheme continues to this day.

## COUNT ONE
## VIOLATIONS OF THE FALSE CLAIMS ACT
## VIOLATIONS OF 31 U.S.C § 3729(a)(1)(A)

79.     Relators reallege and incorporate by reference the allegations contained in all previous paragraphs as if fully stated in this Count.

80.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A).

81.     As a result of the misconduct alleged herein, Defendants knowingly presented, or caused to be presented, to the United States false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

82.     The United States, unaware of the false or fraudulent nature of these claims, paid such claims when it would not otherwise have done so if it had known the truth.

83.     By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount to be proven at trial.

### COUNT TWO
### VIOLATIONS OF THE FALSE CLAIMS ACT
### VIOLATIONS OF 31 U.S.C § 3729(a)(1)(B)

84.      Relators reallege and incorporate by reference the allegations contained in all previous paragraphs as if fully stated in this Count.

85.      This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(B).

86.      As a result of the misconduct alleged herein, Defendants made, used, or caused to be made or used, false records or statements material to false or fraudulent claims  to the United States of 31 U.S.C. § 3729(a)(1)(B).

87.      The United States, unaware of the false or fraudulent nature of the claims, paid such claims when it would not otherwise have done so if it had known the truth.

88.      By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount to be proven at trial.

### COUNT THREE
### VIOLATIONS OF THE FALSE CLAIMS ACT
### VIOLATIONS OF 31 U.S.C § 3729(a)(1)(C)

89.      Relators reallege and incorporate by reference the allegations contained in all previous paragraphs as if fully stated in this Count.

90.      By engaging in the misconduct alleged herein, Defendants conspired with one another to violate 31 U.S.C. § 3729(a)(1)(A) and (B), in violation of 31 U.S.C. § 3729(a)(1)(C).

91.      Defendants knew it was unlawful to violate or cause another to violate the FCA and that it was unlawful to submit claims to Medicare for therapy services that were not reasonable or medically necessary.

21

92.     By virtue of Defendants conspiring to and violating the FCA, the United States has been damaged in a substantial amount to be determined at trial.

### COUNT FOUR
### VIOLATIONS OF TEXAS MEDICAID FRAUD PREVENTION ACT
### TEX. HUM. RES. CODE § 36.002(1)

93.     Relators reallege and incorporate by reference the allegations contained in all previous paragraphs as if fully stated in this Count.

94.     This is a claim for three times the amount of payment received by Defendants, as well as damages and penalties, under the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code § 36.001, *et seq.*

95.     Defendants violated Tex. Hum. Res. Code § 36.002(1) by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be made, used, and presented to the State of Texas.

96.     The State of Texas, by and through the State of Texas's Medicaid program, and while unaware of Defendants' fraudulent and illegal practices, paid the claims submitted in connection therewith.

97.     Had the State of Texas known that Defendants violated the federal and state laws cited herein, it would not have paid the claims that Defendants' fraudulent and illegal practices caused to be submitted.

98.     As a result of Defendants' violations of Tex. Hum. Res. Code § 36.002 the State of Texas has been damaged in a significant amount to be determined at trial.

**COUNT FIVE**
**VIOLATIONS OF TEXAS MEDICAID FRAUD PREVENTION ACT**
**TEX. HUM. RES. CODE § 36.002(2)**

99.    Relators reallege and incorporate by reference the allegations contained in all previous paragraphs as if fully stated in this Count.

100.    This is a claim for three times the amount of payment received by Defendants, as well as damages and penalties, under the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code § 36.001, *et seq.*

101.    Defendants violated Tex. Hum. Res. Code § 36.002(2) by engaging in the fraudulent and illegal practices described herein, including knowingly concealing or failing to disclose information that permitted a person to receive payments or benefits that were not authorized, or that were greater than authorized, from the State of Texas.

102.    The State of Texas, by and through the State of Texas's Medicaid program, and while unaware of Defendants' fraudulent and illegal practices, paid the claims submitted in connection therewith.

103.    Had the State of Texas known that Defendants violated the federal and state laws cited herein, it would not have paid the claims that Defendants' fraudulent and illegal practices caused to be submitted.

104.    As a result of Defendants' violations of Tex. Hum. Res. Code § 36.002 the State of Texas has been damaged in a significant amount to be determined at trial.

**COUNT SIX**
**VIOLATIONS OF TEXAS MEDICAID FRAUD PREVENTION ACT**
**TEX. HUM. RES. CODE § 36.002(4)(B)**

105.    Relators reallege and incorporate by reference the allegations contained in all previous paragraphs as if fully stated in this Count.

23

106.     This is a claim for three times the amount of payment received by Defendants, as well as damages and penalties, under the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code § 36.001, *et seq.*

107.     Defendants violated Tex. Hum. Res. Code § 36.002(4)(B) by engaging in the fraudulent and illegal practices described herein, including knowingly making, causing to be made, inducing, or seeking to induce the making of false statements or misrepresentations of material fact regarding information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program.

108.     The State of Texas, by and through the State of Texas's Medicaid program, and while unaware of Defendants' fraudulent and illegal practices, paid the claims submitted in connection therewith.

109.     Had the State of Texas known that Defendants violated the federal and state laws cited herein, it would not have paid the claims that Defendants' fraudulent and illegal practices caused to be submitted.

110.     As a result of Defendants' violations of Tex. Hum. Res. Code § 36.002 the State of Texas has been damaged in a significant amount to be determined at trial.

## COUNT SEVEN
## VIOLATIONS OF TEXAS MEDICAID FRAUD PREVENTION ACT
## TEX. HUM. RES. CODE § 36.002(7)(B)

111.     Relators reallege and incorporate by reference the allegations contained in all previous paragraphs as if fully stated in this Count.

112.     This is a claim for three times the amount of payment received by Defendants, as well as damages and penalties, under the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code § 36.001, *et seq.*

113.     Defendants violated Tex. Hum. Res. Code § 36.002(7)(B) by engaging in the fraudulent and illegal practices described herein, including knowingly making, or causing to be made claims for payment to the Medicaid program for services that were substantially inadequate or inappropriate when compared to generally recognized standards within the relevant discipline or the health care industry.

114.     The State of Texas, by and through the State of Texas's Medicaid program, and while unaware of Defendants' fraudulent and illegal practices, paid the claims submitted in connection therewith.

115.     Had the State of Texas known that Defendants violated the federal and state laws cited herein, it would not have paid the claims that Defendants' fraudulent and illegal practices caused to be submitted.

116.     As a result of Defendants' violations of Tex. Hum. Res. Code § 36.002 the State of Texas has been damaged in a significant amount to be determined at trial.

## COUNT EIGHT
## VIOLATIONS OF TEXAS MEDICAID FRAUD PREVENTION ACT
## TEX. HUM. RES. CODE § 36.002(13)

117.     Relators reallege and incorporate by reference the allegations contained in all previous paragraphs as if fully stated in this Count.

118.     This is a claim for three times the amount of payment received by Defendants, as well as damages and penalties, under the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code § 36.001, *et seq.*

119.     Defendants violated Tex. Hum. Res. Code § 36.002(13) by knowingly engaging in conduct violative of Tex. Hum. Res. Code Ann. § 32.039(b)(1).   Specifically, Defendants

submitted claims for payment to the Texas Health and Human Services Commission which they knew or should have known to be false.

120.    The State of Texas, by and through the State of Texas's Medicaid program, and while unaware of Defendants' fraudulent and illegal practices, paid the claims submitted in connection therewith.

121.    Had the State of Texas known that Defendants violated the federal and state laws cited herein, it would not have paid the claims that Defendants' fraudulent and illegal practices caused to be submitted.

122.    As a result of Defendants' violations of Tex. Hum. Res. Code § 36.002 the State of Texas has been damaged in a significant amount to be determined at trial.

## COUNT NINE
## VIOLATIONS OF TEXAS MEDICAID FRAUD PREVENTION ACT
## TEX. HUM. RES. CODE § 36.002(9)

123.    Relators reallege and incorporate by reference the allegations contained in all previous paragraphs as if fully stated in this Count.

124.    This is a claim for three times the amount of payment received by Defendants, as well as damages and penalties, under the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code § 36.001, *et seq.*

125.    Defendants violated Tex. Hum. Res. Code § 36.002(9) by conspiring with one another to commit each of the violations enumerated in Counts Four through Eight above.

126.    The State of Texas, by and through the State of Texas's Medicaid program, and while unaware of Defendants' fraudulent and illegal practices, paid the claims submitted in connection therewith.

127.    Had the State of Texas known that Defendants violated the federal and state laws cited herein, it would not have paid the claims that Defendants' fraudulent and illegal practices caused to be submitted.

128.    As a result of Defendants' violations of Tex. Hum. Res. Code § 36.002 the State of Texas has been damaged in a significant amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Relator respectfully requests this Court to award judgment of the following to the plaintiff and against Defendants:

To the UNITED STATES:

a.  Three times the amount of damages which the United States has sustained as a result of Defendants' fraudulent and illegal practices; and,

b.  the maximum civil penalty each false claim or unlawful act as provided by 31 U.S.C. § 3729(a)(1) and adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (see 28 C.F.R. § 85.5); and,

c.  Prejudgment interest; and,

d.  All costs incurred in bringing this action; and,

e.  Such further relief as this Court deems equitable and just.

To the STATE OF TEXAS:

f.  Three times the payment which the State of Texas has paid Defendants as a result of Defendants' fraudulent and illegal practices;

g.  The maximum civil penalty each false claim or unlawful act as provided by Tex. Hum. Res. Code § 36.052(a)(3);

h.  Prejudgment interest;

i.  All costs incurred in bringing this action; and

j.  Such further relief as this Court deems equitable and just.

To the RELATORS:

k.  The maximum amounts allowed under the FCA;

l.  The maximum amounts allowed under the Texas Medicaid Fraud Prevention Act;

m.  Reimbursement for reasonable expenses that Relators incurred in connection with this action; and,

n.  An award of reasonable attorneys' fees and costs; and,

o.  Such further relief as this Court deems equitable and just.

## JURY TRIAL DEMAND

Relator hereby demands a trial by jury.

Respectfully submitted,

Mitchell R. Kreindler (Tex. Bar No. 24033516)
Roland W. Riggs (N.Y. Bar No. 4321170)
KREINDLER & ASSOCIATES
6500 River Place Blvd., Bldg. 7, Ste. 250
Austin, Texas 78730
mkreindler@blowthewhistle.com
rriggs@blowthewhistle.com
T 713.647.8888
F 713.647.8889

Alexandra B. Schmit (Tex. Bar No. 24006895)
SCHMIT LAW FIRM PLLC
1100 Lakeway Drive, Suite 101-A
Austin, Texas 78734
aschmit@schmitlawfirmpllc.com
T 877.577.1549 Ext. 101
F 512.271.6838

ATTORNEYS FOR PLAINTIFFS/RELATORS
MONTIE BLAND AND BRIAN ELLISON